IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

UNITED STATES OF AMERICA    )
                            )
            v.              )        CRIMINAL NO. 2:24-cr-78
                            )
GARY OWENS, JR.,            )
                            )
            Defendant.      )

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, by and through its undersigned counsel, hereby submits its position on the sentencing of Gary Owens, Jr. ("defendant"). The defendant has pleaded guilty to sexual exploitation of a minor, often referred to as production of child sexual abuse material (CSAM), in violation of 18 U.S.C. § 2251(a) and (e). He produced or attempted to produce CSAM depicting at least 35 teenage boys in the space of just one year, and also possessed at least 1800 images and videos of CSAM and age questionable files in folders spanning 2019 through 2021 and 2023, the corresponding chats for which he deleted. He obtained these images by tricking his victims into falsely believing he was a minor girl, rather than a middle-aged man. His victim count is undoubtedly much higher than 35. The applicable guidelines range has been correctly calculated in the Presentence Investigation Report ("PSR") as life imprisonment, restricted by the statutory maximum of 30 years' imprisonment. *See* Dkt. No. 35 (PSR), at Part D. For the reasons that follow, the United States submits that a sentence of 30 years, less than one year for each of the defendant's known victims, is sufficient but not greater than necessary to effectuate the statutory sentencing factors under 18 U.S.C. § 3553(a). The Court should further

impose a lifetime of supervised release, forfeiture of the electronic devices used in connection with the offense, and special assessments as set forth by statute.

<u>**FACTUAL BACKGROUND AND PROCEDURAL POSTURE**</u>

**I.**     **The defendant used a false persona to hide his identity and trick his victims.**

The defendant used a ruse to disguise his true identity to his victims and to avoid the attention of law enforcement; he was detected almost entirely by accident and otherwise could have continued preying on children for many years to come.  In 2022, the FBI received information from the National Center for Missing and Exploited Children (NCMEC) about an unrelated possible "sextortion" of Minor 1, a 17-year-old boy living in northern Virginia.  The FBI interviewed Minor 1 and reviewed the contents of his phone.  In doing so, the FBI discovered a conversation between Minor 1 and a user later identified as the defendant, which occurred around October 31, 2022, and was consistent with the defendant's later proven methodology for preying on teenage boys.

The defendant, a 40-year-old man, posed as a female close in age to the teenage boys whom he victimized.  The defendant often met his victims on Instagram before moving the conversation to Kik, presumably because Kik cleared chat messages automatically upon log out.  Using Kik was thus another way for the defendant to conceal his crimes.  The defendant used publicly-available images of an adult film star to convince his victims that he was in a fact a minor female.  In this persona, the defendant made increasingly explicit demands for images and videos of minor boys.  As a result of specific requests from the defendant, in just the original October 31, 2022, conversation, Minor 1 sent an eight second video in which he removed his underwear and exposed his erect penis to the camera; a seven second video in which he used his hand to masturbate his erect penis; and a picture of a towel with what appears to be semen on it.

When law enforcement interviewed Minor 1, he stated that he first met the persona later identified as the defendant online two years before, when he was 15 years old.

Law enforcement finally managed to identify the defendant based on IP addresses used to access the persona Kik account both from the defendant's place of work and his home, where they executed a search warrant. The defendant's collection of child sexual abuse material was kept on his iPad. That iPad contained Google searches for the adult film star whom he was impersonating online, and an adult pornography website where the defendant searched for images of the film star to use as part of his online persona.

The defendant took steps to hide his collection in a "Calculator%" application, which on its face appeared to be a normal calculator but was actually used to store files, including pictures and videos. This "Calculator%" application contained six folders – one with the adult film star's first name, which contained pictures and videos of her in some stage of undress or engaged in a sex act, as well as folders labeled "2019," "2020," "2021," "2022," and "2023." The "2022" folder was the first one examined by law enforcement as that year corresponded with the pre-existing excerpt of the chat in which the defendant victimized Minor 1. Within the "2022" folder, law enforcement found 904 images and videos, most of which showed males in some stage of undress or engaged in a sex act; these images included pictures and videos of Minor 1.

Although the defendant deleted the 2022 Kik chats off this iPad in an attempt to conceal his actions, a forensic tool was able to retrieve them despite his best efforts. This tool allowed law enforcement to review the chats and, by hand, attempt to match the images exchanged within those chats with the seemingly preferred images that the defendant saved from those chats in the 2022 folder. This painstaking review was the only way that law enforcement was able to identify the 35 known victims in this case. That review also proved that law enforcement is still

missing chats. It is clear from the existing chats that the defendant and his victims continued to communicate on Instagram at the same time as they communicated on Kik, and those chats were deleted from the defendant's Instagram account. In many cases, there is also context missing from the existing chats, indicating that the parties had both previous and contemporaneous communications that are missing. It is impossible to know the full extent of the defendant's victimization of these 35 known teenagers.

The "2019," "2020," "2021," and "2023" folders contained similar content, and ultimately law enforcement calculated that the defendant's collection contained at least 1800 images and videos of child sexual abuse material and age questionable material. However, because the defendant took steps to delete his Kik chats and a forensic tool could not recover these chats, law enforcement was unable to do a similar comparison between chats and the images in those folders. Thus, while it is reasonable to conclude that the defendant's conduct in 2022 is the same conduct in which he engaged in 2019, 2020, 2021, and 2023, and that the images in those folders represent the defendant's preferred sexually explicit images from the minors he victimized in those years, his actions mean that those victims may never be identified. Thus, 35 victims is apparently a vast undercounting of the harm that the defendant perpetrated on children in that five year span.

## II.    The defendant coerced boys to engage in nonconsensual sex acts and create new, sexually explicit images of themselves and other minors in their lives.

The defendant was highly manipulative to get the images he desired, exploiting teenage boys despite their often evident discomfort with his repeated requests for anally-focused or mutually-masturbatory content with their friends and even family. The defendant insisted on role-play in which he was "dominant" and his victims were "submissive." He described this relationship to Minor 8 (15-years-old) in February 2022 as "like i command you to do stuff and

you do it and you get rewarded when i say you do good but it's only for serious ppl lol." He described it to Minor 14 (16-years-old) in July 2022 as "so if you're submissive then you're submissive to me," "i tell you to do things," "you do them," "and if you're good i reward you from time to time," "we end by cumming together[,]" "you're here to turn me on and do what i say." These roles gave the defendant power to coerce or attempt to coerce his victims into doings things that they did not want to do.

The defendant's requests included images of anal penetration and recording sex acts with other people in these minor's lives like male friends, sexual partners, and siblings. The chat excerpt for Minors 12 (17-years-old) and 13 (13-years-old) in the Statement of Facts, in which the defendant tried to get Minor 12 to take sexually explicit pictures of his sleeping, completely vulnerable 13-year-old brother, is just one particularly egregious example. PSR at ¶ 13(14). Similarly, in August 2022, the defendant pushed Minor 6 (16-years-old) to compare his penis size with other boys, in particular his brothers. Minor 6 responded that one brother was 13-years-old, the other was older and "I don't rly look at his dick." When the defendant pushed, saying "my friend she told me that guys compare all the time i figured you did idk," Minor 6 replied "Not w brothers." The defendant assured Minor 8 (15-years-old) that "homemade [porn] is where it's at you like brother sister or sum or like three ways" and then asked Minor 8 if he would "fuck a brother or sister."

In addition to family members, the defendant pressured his victims, who repeatedly told him that they were not gay, bi-sexual, or otherwise interested in male-on-male sexual activity, to engage in sex acts with their male friends and even record those acts. For example, the defendant told Minor 6 (16-years-old) "just jerk off with a friend for i'll cum for you guys so it's not gay or anything" "it would be hot." Minor 6 responded "Bro I'm not doing that." The

defendant tried to set up a sexual encounter with Minor 21 (17-years-old), pushing him to agree

to meet up with another male and the defendant, who was of course posing as a girl:

| | |
|---|---|
| Defendant: | *you said you'd let a guy blow u right* |
| Minor 21: | *Yea but that is about it why do you ask?* |
| Defendant: | *cuz i think we can work out a deal* |
| Minor 21: | *A deal?* |
| Defendant: | *let a guy blow u for me and i'll come to you and let u fuck me abs drop a* |

*load in me*

| | |
|---|---|
| Minor 21: | *I don't know any guys that will do tho tough can you help me find one?* |
| Defendant: | *yeah i csn try* |
| | *where you live again* |
| Minor 21: | *Chesapeake* |
| Defendant: | *like you want me to just find any guy* |
| Minor 21: | *Do they have to be a guy or can they identify as one?* |
| Defendant: | *you got someone?* |
| Minor 21: | *Yes if that's what it takes to see you* |
| | *I know someone that identifies as a guy does that work?* |
| Defendant: | *lemme see then* |
| | *Them* |
| Minor 21: | *I don't have any pics sadly but I can try to get him* |
| Defendant: | *meh tbh i want a guy to do it* |
| | *would you touch him too* |
| | *like while he blows you* |
| Minor 21: | *100% honest no because I don't like doing stuff like that with guys all I* |

*would let them do is blow me that is why I just want to do stuff with you idc was stuff as long as*
*it just is and no one else*

| | |
|---|---|
| | *Is that ok?* |
| Defendant: | *ok as long as it's a guy* |
| Minor 21: | *And then it's only me and you doing stuff?* |
| Defendant: | *yes* |
| Minor 21: | *And what if I let you fuck my ass instead of a guy blowing me?* |
| Defendant: | *i don't have a dick lol* |
| Minor 21: | *Strap on* |
| | *Actually nvm if you find a guy to blow me I will do it will you be in the* |

*same room or?*

| | |
|---|---|
| Defendant: | *idk i guess it doened s* |
| | *depends* |

With Minor 25 (17-years-old), the defendant claimed not to believe his victim was bi-

sexual and demanded he provide proof of a sexual encounter with another boy before the

defendant would believe it: "Let's prove that you're bi.  Get a buy to blow you and I'll show you

the video of me and girl making each other cum." The defendant followed up one month later: "you said you got vides of you getting head right."

The defendant also regularly asked for recordings of his victims having sex with their female partners, thus seeking the exploitation of additional children beyond those with whom the defendant was directly interacting. For example, the defendant asked Minor 5 (16-years-old) "you made vids with ur girl" "you should" "wouldn't it be hot to watch her suck ur cock anytime." He followed-up one month later: "you got any vids with someone yet bby." The defendant asked Minor 22 (16-years-old) "did you make a video" after learning Minor 22 had sex with his girlfriend. He also urged Minor 26 (14-years-old) to take pictures with his girlfriend, later asking "you record your and the girl" and replying "awe damn" when Minor 26 said no.

The defendant also regularly asked for images of his victims' assholes and for them to anally penetrate themselves, even when those victims expressed great discomfort with the idea. For example, Minor 2 (17-years-old) told the defendant "I'll draw the line" at "play with ur ass" and refused to do "something I'm not comfortable with." The defendant re-raised the issue a couple of months later. Despite reiterating, "[s]orry just not sending anything with my butt," he later relented. The defendant refused to share more images of his own female alias until Minor 2 relented, telling him "not til i see ur ass lol," and Minor 2 finally sent a picture of what he had clearly stated was a red line for him. Minor 21 (17-years-old) told the defendant "I don't want to do ass stuff," "Please don't I really don't like that stuff so please don't make me do that," and "Don't be mad that I don't want to do that." This is the same minor that the defendant later tried to push into a threesome with a man and the defendant (who was pretending to be a girl). Perhaps the most disturbing example occurred with Minor 26 (14-years-old) whom the defendant

convinced to anally penetrate himself.  Minor 26's reaction afterwards clearly shows the trauma

resulting from what the defendant was doing:

| | |
|---|---|
| Defendant: | *you want me in your ass bby* |
| Minor 26: | *do you want to be in my ass?* |
| Defendant: | *i ask you bby* |
| Minor 26: | *you mean like licking my ass?* |
| Defendant: | *that or fingers or i could use a toy on you* |
| Minor 26: | *that sounds nice* |
| Defendant: | *which one* |
| Minor 26: | *any of them* |
| Defendant: | *you want me to find a friend to put their dick inside you while i give you head* |
| Minor 26: | *yes please* |
| Defendant: | *should i role play as a guy* |
| | *would that get you off* |
| Minor 26: | *maybe* |
| Defendant: | *ok do you wanna try* |
| Minor 26: | *i get off on visuals tho so idk* |
| Defendant: | *i can try to send some dick pics if u want* |
| Minor 26: | *idk* |
| Defendant: | *you ever watch dicks like in porn or stuff* |
| | *like guys giving head* |
| Minor 26: | *not really* |
| Defendant: | *but you wanna be fucked* |
| Minor 26: | *idk* |
| | *maybe* |
| | *i'm still figuring that part out* |
| Defendant: | *tbh i think it's hot* |
| | *if ur bi it's cool with me i am too* |
| | *and i won't tell anyone* |
| Minor 26: | *idk i'm still kind of figuring it out* |
| Defendant: | *ok well want me to role play and talk about fucking your ass* |
| Minor 26: | *i want to do what will get you off* |
| Defendant: | *thst will tbh* |
| | *lots of ass play* |
| | *got any toys* |
| Minor 26: | *unfortunately no* |
| | *maybe* |
| | *idk actually* |
| Defendant: | *what you got* |
| Minor 26: | *not toys but stuff i could use as a toy* |
| Defendant: | *like what show me* |
| Minor 26: | *idk i'm trying to think about what i have* |
| Defendant: | *brushes maybe* |

Minor 26:     *i have brushes*
Defendant:    *lemme see*
Minor 26 sends a picture.
Defendant:    *you want try one*
Minor 26:     *i want do what will get you off*
Defendant:    *i wanna fuck you* [redacted]
Minor 26:     *okay mommy*
              *which brush should i use*
Defendant:    *brown*
              *lemme watch you slide it in*
Minor 26:     *okay*
Defendant:    *what you using for lube*
Minor 26:     *lotion*
Defendant:    *lemme see you prep*
Minor 26:     *oh i just did*
Defendant:    *csn i see*
Minor 26 sends an image.
Defendant:    *like ur ass bby*
              *you need some there*
Minor 26:     *oh*
Defendant:    *yeah bby*
Minor 26 sends an image.
Defendant:    *mmmm yes bby*
Minor 26:     *should i stick it in*
Defendant:    *yes lemme watch*
Minor 26 sends an image.
Defendant:    *how is it*
Minor 26:     *good*
Defendant:    *you hard*
Minor 26:     *a little*
Defendant:    *lemme watch you fuck urself*
Minor 26 sends an image.
Defendant:    *do a body video while ur doing thst*
Minor 26:     *i think i'm done doing this for right now*
Defendant:    *like the comb?*
Minor 26:     *yeah*
Defendant:    *ok you hard*
Minor 26:     *not really*
Defendant sends an image.
Defendant:    *lmk ig that helps*
              *??*
              *Bby*
Minor 26:     *yeah that helped*
              *would i be able to watch you do something like that tonight?*
Defendant:    *did you cum*
Minor 26:     *no*

| | |
|---|---|
| Defendant: | *oh i thought you did* |
| | *cuz you got quiet* |
| Minor 26: | *no i just had to do something rq* |
| Defendant: | *oh what happened* |
| Minor 26: | *i just put the brush up* |
| | *so would i be able to see you do something like that tn?* |
| Defendant: | *oh okay if you get me there but i stopped cuz i thought you was gone after* |
| *i sent it haha* | |
| Minor 26: | *is that from tonight?* |
| Defendant: | *no lol it's too dark rn* |
| Minor 26: | *oh okay* |
| Defendant: | *i'm sorry are you mad* |
| Minor 26: | *no i just want to watch you do that to yourself tn?* |
| Defendant: | *i might be able to if i get back in the mood* |
| | *how was the brush* |
| Minor 26: | *it's was alright* |
| Defendant: | *it would probably be better if it was a d* |
| Minor 26: | *yeah* |
| | *yeah* |
| Defendant: | *wyd babe* |
| | *where'd you go* |
| | *babe??* |

## III.    Procedural Posture

On May 21, 2024, the defendant was charged via criminal complaint with sexual exploitation and attempted sexual exploitation of children, in violation of 18 U.S.C. § 2251(a) and (e), and coercion and enticement and attempted coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b) for his chats with Minor 1.  ECF Nos. 3 & 4.  The defendant had his initial appearance on June 26, 2024.  ECF No. 7.  He waived his right to a preliminary hearing and the magistrate held a detention hearing on July 1, 2024, which resulted in an order that the defendant be detained pending trial.  ECF Nos. 14 & 16.

On July 24, 2024, the grand jury returned a fourteen-count indictment charging the defendant with six counts of sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a) and (e) (Counts 1, 3, 5, 7, 9, & 11); six counts of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b) (Counts 2, 4, 6, 8, 10, & 12); one count of attempted sexual exploitation

of a minor, in violation of 18 U.S.C. § 2251(e) (Count 13); and one count of possession of material involving the sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (Count 14). ECF No. 17.

On November 12, 2024, the defendant pleaded guilty to Count One, sexual exploitation of Minor 1. ECF Nos. 26, 27, & 28. As part of his guilty plea, the defendant admitted to relevant conduct with 35 additional minors, including sexual exploitation and attempted sexual exploitation and coercion and enticement and attempted coercion and enticement, as well as possession of material involving the sexual exploitation of minors. ECF No. 28. After the change of plea hearing, the government learned that Minor 36 had just turned 18 years old at the time of the exploitation. Thus, while the defendant apparently believed that Minor 36 was a minor when he sought sexually explicit images from Minor 36, this was not in fact the case. PSR at ¶ 16.

On April 25, 2024, the U.S. Probation Office filed a PSR which calculated the defendant's total offense level as 43 and his criminal history category as I, resulting in a guidelines range of life imprisonment. PSR at ¶¶ 289 & 292. Neither party has submitted any objections to the PSR.

## **LEGAL STANDARD GOVERNING SENTENCING**

Sexual exploitation of a minor carries a minimum term of 15 years' imprisonment and a maximum term of 30 years' imprisonment. *See* 18 U.S.C. § 2251(a) and (e). Following any term of imprisonment, the defendant must be placed on supervised release for a term of at least five years up to life. *See* 18 U.S.C. § 3583(k). The defendant has already consented to forfeiture of the devices listed in the Indictment as property that constitutes the proceeds of the offense, property facilitating the offense, and/or media containing child pornography. ECF No. 30. The

defendant may also be ordered to pay, in addition to the $100 special assessment, the $5,000 special assessment mandated by the Justice for Victims of Trafficking Act of 2015 ("JVTA") for non-indigent defendants. *See* 18 U.S.C. § 3014. The defendant may also be ordered to pay an assessment of up to $50,000 as mandated by the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 ("AVAA"). *See* 18 U.S.C. § 2259A(a)(3).

As to the JVTA, while the defendant may be indigent, PSR at ¶ 322, despite "numerous request[s]" from the U.S. Probation Office, he has "failed to sign the credit release document . . . to allow the probation officer to complete an Equifax credit search. As such, the defendant's financial investigation was impeded" and his financial information could not be verified, PSR at ¶ 320. The defendant should be required to provide the necessary paperwork to verify his financial condition before the Court makes any determinations as to indigency.

As to the AVAA, which provides payments to victims of child sexual exploitation, https://www.justice.gov/dmavr, given the lack of any restitution requests or anticipated restitution order in this case, as well as the sheer number of victims in this case, the government submits that an order in the full amount of $50,000 is appropriate in light of the 18 U.S.C. § 3553(a) factors and requests the Court order the same.

## I.    Combined Adjusted Offense Level

In fashioning a criminal sentence, a district court must "first calculate the applicable [U.S. Sentencing] Guidelines range." *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). After calculating the guidelines range, the district court "must give both the government and the defendant 'an opportunity to argue for whatever sentence they deem appropriate.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The district court must then consider all of the factors set forth in 18 U.S.C. § 3553(a) to determine whether those factors support the sentence

requested by either party.  *Id.* (citing *Gall*, 552 U.S. at 49).  In doing so, the district court may not presume that a sentence within the guidelines range is reasonable.  *Id.* (citing *Gall*, 552 U.S. at 50); *see also Nelson v. United States*, 555 U.S. 350, 351–52 (2009).  Rather, the court "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.

In the event that the district court imposes a sentence outside the guidelines range, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Pauley*, 511 F.3d at 473 (quoting *Gall*, 552 U.S. at 50).  After deciding an appropriate sentence, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50.  The Fourth Circuit has also held that "a sentencing court must address the parties' nonfrivolous arguments in favor of a particular sentence, and if the court rejects those arguments, it must explain why in a sufficiently detailed manner to allow this Court to conduct a meaningful appellate review."  *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017).

Here, the PSR correctly calculated the offense level and adjustments, and neither party has objected to that calculation.  The government agrees that the defendant has assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.  U.S.S.G. § 3E1.1(b).  Accordingly, the United States moves this Court to apply an additional one-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b).  The resulting total offense level is 43, and the advisory guidelines range is life imprisonment.  In accordance with the terms of the plea agreement, the government may ask for a sentence up to 30

years and the defendant may ask for a sentence as low as 25 years.  ECF No. 27 at 3.  The Court is not bound by the parties' agreement.

## II.    The Statutory Sentencing Factors

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant.  *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  As explained below, consideration of these factors supports a 30-year sentence in this case.

### A.    The Nature, Circumstances, and Seriousness of the Defendant's Conduct

The conduct to which the defendant has pleaded guilty in this case is both a small portion of and a culmination of the five-year period in which he victimized scores of teenage boys online.  As described above and in the Statement of Facts, in 2022 alone, the defendant coerced and enticed 35 boys between the agents of 14 and 17 to create sexually explicit images for his sexual gratification.  The defendant did so in the persona of an age-appropriate, fellow teenager, a girl, who was apparently seeking out boys who were sexually interested in the fact that she was a girl and their age.  The defendant presumably used a ruse because he knew that if he approached these teenage boys as himself, a 40-something year old man looking for boys also interested in males, he would be rebuffed.  The defendant's victims never had any desire or intention to engage sexually with, nor to create and send sexually explicit images to an adult

male.  However, because the defendant engaged his victims in this way, he was able to manipulate them into a "dominant/submissive" relationship structure, to coerce them into engaging in sex acts that made them uncomfortable and to which they did not truly consent. Minor 26's withdrawal and silence after being convinced to masturbate with a brush on camera should tell the Court all it needs to know about the potentially life-long trauma which the defendant imposed on his victims.

The defendant also tried to expand his victim pool and turn his victims into perpetrators themselves.  He pushed them to engage in sex acts with their family members and friends, and to film those interactions and their sexual encounters with partners.  None of these family members, friends, or sexual partners consented to be used to create sexually explicit material for the defendant's sexual gratification.  If any of these victims had actually agree to the defendant's proposal, they would have been creating child sexual abuse material of their friends, partners, and even younger family members as in the case of Minors 12 and 13, thereby turning these victims into perpetrators themselves.  The defendant simply had no qualms about the number of children he hurt in his quest to fulfil his own sexual desires.

Disturbingly, these 35 chats are simply the ones that the defendant failed to completely delete, representative of only one year out of five in which the defendant appears to have engaged in this conduct.  As described above, the defendant had folders labeled "2019," "2020," "2021," "2022," and "2023."  Each folder contained similar material, over 1800 sexually explicit images and videos of minor boys and young men.  However, only the "2022" folder could be matched up with recovered Kik chats on the defendant's iPad, which meant that law enforcement was only able to identify the victims whose images were captured and saved in 2022.

Extrapolating out, the defendant could have victimized well over 100 teenagers in just a five-year period.

"Long-term studies" confirm that "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways in which no just or human society can tolerate." *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority). "When child pornography is produced in conjunction with the sexual abuse of children, . . . the harm to the child victims is magnified and perpetuated." *Id.* at 1208. The Fourth Circuit has long held that "child pornography crimes are grave offenses warranting significant sentences." *United States v. Johnson*, 242 F. App'x 7, 11 (4th Cir. 2007). A 30-year sentence is absolutely appropriate in light of the defendant's conduct.

B. <u>The History and Characteristics of the Defendant</u>

The defendant's history and characteristics make his conduct in this case all the more difficult to comprehend. He is now 42 years old. His parents divorced when he was an infant, and he moved around with his mother before residing with his father for the last two years of high school. He enlisted in the United States Marine Corps between August 2000 and November 2003, when he was honorably discharged. The defendant and his future husband started dating in 2009, were married in 2016, and divorced in 2024. The defendant reported a good relationship with his family, and that they were supportive and accepting of the fact that he is gay. He self-reports no issues with alcohol or drugs, and no mental or emotional health issues. The defendant has no criminal history, was gainfully employed, and owned a home with his now-ex-husband.

In sum, between 2019 and 2023, the defendant was married, financially and residentially stable, sober, and supported by his family. It is difficult to understand why he elected to act out

sexually with scores of teenage boys and to do so in such a manipulative and coercive way. If the defendant was looking for a male sexual partner outside his marriage, he had many legal options, on and offline. Instead, the defendant made a conscious choice to seek out age-inappropriate boys to manipulate, abuse, and confuse about healthy sexual relationships just as they were becoming sexually mature, and this manipulation of the defendant's victims about their sexual preferences appears to have been the point.

C. Just Punishment, Respect for the Law, Adequate Deterrence, and Protection

A significant sentence is absolutely necessary in this case to deter the defendant and others from engaging in this conduct in the future. Incapacitation – preventing the defendant from reoffending at all – should be a primary objective of the Court's sentence. The defendant's dangerousness is evident from his pattern of grooming and exploiting boys online. He sexually abused 35 boys in just one year; the evidence suggests that he replicated that number four times over and stopped only because he was caught. The fact that the internet made the defendant anonymous and his victims easier to reach in no way lessens the trauma of what he did to them.

Moreover, a strong sentence here is critical to address "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003). And even if a defendant *could* be described as a "low risk" to recidivate, "[a] low risk is not the same as no risk." *Irey*, 612 F.3d at 1216-17. "Adequate protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur." *Id*. at 1217; *cf. United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) ("The sadistic nature of much of the child pornography consumed by the defendant is another reason to worry about his being on the loose.").[1] Here,

---

[1] "Nor does the fact that [the defendant] will be subject to restrictions and supervised release [if] he gets out of prison offer any guarantee that he will not commit any crimes." *See Irey*, 612 F.3d

both factors clearly point towards a lengthy period of incapacitation. The defendant and those who think like him need to understand that they risk lengthy prison sentences for this conduct and, perhaps, decide the risk is too much.  The sentence in this case must constitute a loud and clear warning that severe consequences will result from such acts.

Indeed, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'" *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'"  *Id*. (citation omitted); *accord United States v. Garthus*, 652 F.3d 715, 721-22 (7th Cir. 2011); *see also Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand.").  Distressingly, the market for child pornography has continued to grow, and to become more depraved, in recent years. *See, e.g*., U.S. Sent'g Comm'n Hr'g on the Child Pornography Guidelines 1-2 (Feb. 15, 2012) (statement of James M. Fottrell, Steve DeBrota & Francey Hakes, Dep't of Justice), available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf.

That depravity is evident in this case. The need for effective deterrence through a severe sentence here is therefore essential.  The government's recommendation of thirty years, which reflects less than a year in custody for each of the <u>known</u> victims, accomplishes this goal.

---

at 1215 (discussing studies and other data showing that "supervised release . . . often fails to prevent sex offender recidivism").  In short, "[s]upervised release is better than unsupervised release, but it does not offer society the level of protection from a convicted criminal that incarceration does."  *Id.* at 1216.

### III.    Supervised Release Conditions

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release here is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See, e.g.*, Lifetime Consequences for Sex Offenders Act of 2002, H.R. Rep. No. 107–527 at 2 (2002) ("[S]tudies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes [and that] . . . the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66, at 49–50 (2003) (discussing how amendment to 18 U.S.C. § 3583(k) "responds to the long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders . . . whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison"). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, *see* U.S.S.G. § 5D1.2(b) (Policy Statement), and the Fourth Circuit has observed that § 3583(k) and 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citations omitted).

Here, the defendant has proven himself dangerous to every teenage boy he can access on the internet, and to their family members, friends, and sexual partners. He has an obvious,

demonstrated sexual interest in children that he is motivated to gratify at all costs and no matter the harm. He has also proven adept at avoiding detection, thus prolonging the period of time in which he can offend before facing the consequences of his actions. Therefore, the United States believes that it is appropriate to impose a lifetime term of supervised release with the conditions of supervision contemplated under 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3(d)(7) for sex offenders required to register under the Sex Offender Registration and Notification Act.

To comply with the Fourth Circuit's decision in *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020), and *United States v. Singletary*, 984 F.3d 341 (4th Cir 2021), the government requests that the Court orally pronounce all conditions of supervised release other than those specifically designated as mandatory under 18 U.S.C. § 3583(d). In addition to an oral pronouncement of the individual conditions, compliance with *Rogers* may be achieved by oral reference on the record to another document, such as the PSR. *Rogers*, 961 F.3d at 299. Here, the U.S. Probation Office has outlined the mandatory and standard supervised release conditions, as well as recommended special conditions, on pages 81 through 85 of the PSR. The government requests that the Court impose all of those conditions.

## IV.    Forfeiture & Restitution

The parties previously filed a consent order of forfeiture, and the United States asks that the Court enter the final such order at sentencing.

To date, the United States has not received any victim impact statements or restitution requests in this case. It will update opposing counsel, the Court, and the Probation Office should that change prior to sentencing.

## <u>CONCLUSION</u>

For the reasons stated above, the United States respectfully requests that the Court

impose a term of 30 years' imprisonment, a lifetime of supervised release, a $100 special

assessment pursuant to 18 U.S.C. § 3013, and JVTA and AVAA assessments as discussed above.

Respectfully Submitted,

Erik S. Siebert
United States Attorney

By: _____/s/_____
Laura D. Withers
E. Rebecca Gantt
Assistant United States Attorneys