**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
*Norfolk Division*

**UNITED STATES OF AMERICA**

         **v.**                          **Case Nos. 2:24CR78**

**GARY OWENS, JR. ,**

         **Defendant.**

<u>**POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS**</u>

COMES NOW the Defendant, Gary Owens, Jr., ("Mr. Owens"), by counsel, pursuant to Section 6A1.2 of the *Sentencing Guidelines and Policy Statements* and this Court's Sentencing Order and submits his position with respect to the sentencing factors. Mr. Owens has no objections to the Pre-Sentence Report ("PSR").

<u>**The Sentence Requested**</u>

Mr. Owens is before this Court for sentencing after entering a plea of guilty, pursuant to a written agreement, to Sexual Exploitation of a Minor, in violation of 18 U.S.C. § 2251 (a) and (e). Mr. Owens respectfully requests that the Court sentence him to 300 months, followed by a 10-year term of supervised release. Such a sentence would accomplish the goals outlined in the statute, of retribution, deterrence, incapacitation, and rehabilitation. Moreover, the requested sentence complies with the mandate to impose a sentence "sufficient, but not greater than necessary" to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

Mr. Owens is sincerely remorseful about what his did. He deeply regrets what he has done and intends to do all he can to turn his life around. Throughout this process,

he has been completely truthful and forthright about his crimes.  He freely admitted guilt in court at the time of the plea and during his meeting with the probation officer.

## Mr. Owens's History and Characteristics

Mr. Owens was born in New Haven, Connecticut to a teenage mother.  His parents, Deborah Tobey Parker and Gary Owens, Sr., were married to each other but separated when he was an infant.  He was raised in Georgia by his mother and stepfather, Albert Marsili. His mother worked in the healthcare field and his stepfather was a manager of a deli and then an Italian restaurant. He has three maternal half-siblings and three paternal half siblings. He was raised with three maternal half-brothers.

Although Mr. Owens was raised in a two-parent home for most of his youth, his upbringing was scarred by the impact of living with alcoholism. When a parent or primary caregiver has an alcohol use problem, children in the home can experience a wide range of cognitive, behavioral, psychosocial, and emotional consequences. Many of these children are regularly exposed to chaos, uncertainty, disorganization, emotional and/or physical neglect, instability, arguments, marital problems, and more. [1] As a result, these kids may experience or exhibit anxiety, depression, antisocial behavior, relationship difficulties, behavioral issues, etc. [2]

Having an alcoholic parent can negatively impact any and all aspects of a child's life.  This includes adolescent development and adjustment by interfering with parenting

---

[1] https://americanaddictioncenters.org/alcohol/support-recovery/family
[2] Id.

skills and marital relations. [3] Problem drinking by parents may negatively influence important parenting skills that serve to nurture and provide guidance for children. For example, problem drinking may contribute to inconsistency or unpredictability in parenting behaviors. [4]  Alcoholic parents also may provide lower levels of emotional availability.

Alcoholism and substance abuse can lead parents to model ineffective coping strategies and other problem behaviors. Children with problem-drinking parents are at risk for alcohol and other drug use as well as for psychological problems. [5] A range of research in related fields (e.g., on the relationship between maternal depression and child functioning) indicates that such inconsistency in parenting may undermine a child's sense of order, control, and stability in the family environment, reducing both feelings of self-esteem and perceptions of self-competence. [6]

Sadly, Mr. Owens life exhibited many of these negative aspects.  His home was marked by violence and instability as both of his parents struggled with addiction.  His mother has struggled with alcoholism and substance abuse.  Her drugs of choice were varied to include pain medication, alcohol and on one occasion, medication prescribed to a family pet.  In addition, Mr. Owens recalls a time when his mother spent time in jail.

---

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6876511/ Effect of Parental Drinking on Adolescents
Michael Windle, Ph.D.
[4] Holmes JS, Robins LN. The influence of childhood disciplinary experience on the development of alcoholism and depression. *Journal of Child Psychology and Psychiatry*. 1987;28:399–415.
[5] Id.
[6] Downey G, Coyne JC. Children of depressed parents: An integrative review. *Psychological Bulletin*. 1990;108:50–76.

Mr. Owens stepfather was an alcoholic.   There were multiple instances where his stepfather became violent towards Mr. Owens's mother. This violence was also directed at Mr. Owens as he I tried to intervene on behalf of his mother.  Both he and his mother were often injured and on one occasion his stepfather kicked him in the head and pushed down the stairs.  The violence did not end until his mother divorced his stepfather and they moved out of the home.

Although Mr. Owens was not sexually abused as a child, he was the victim of his stepfather's inappropriate and disturbing behaviors.  When he was approximately age 9 or 10, his stepfather made inappropriate sexual gestures to him. His stepfather masturbated in the hallway, where he could be clearly seen.  In addition, he would sometimes lay in bed with Mr. Owens in his boxers. Experiencing these erratic behaviors of a violent, alcoholic stepfather only added to the chaos and instability of Mr. Owens's formative years.

His mother and stepfather divorced in the 1990s while Mr. Owens was in high school. When Mr. Owens was getting ready to enter his junior year of high school, he "ran away" to his father's home when his mother began dating a man Mr. Owens did not get along with. He completed high school and earned his diploma in Florida. Mr. Owens joined the Marine Corps in 2000. He worked in logistics, and he achieved a rank of E-2. He received an honorable discharge after four years of service. Since completing his time in the Marine Corp, he has primarily worked in property management. Mr. Owens always had a close relationship with his paternal grandmother. At some point, she started facilitating occasional contact between him and his biological father. His father has

4

remarried, and he described his stepmother as "great." Mr. Owens reported he maintains a relationship with his mother and father.

Mr. Owens married Casey Martinez in October 2016. He and his husband had been together since 2009. Nonetheless, he said they lacked intimacy and grew apart. They separated in July 2022, and their divorce was finalized 18 months later. They do not have any children. His primary support system is his mother. He also maintains communication with his father, ex-husband, and ex-boyfriend.

In the months since the offense, Mr. Owens has demonstrated a commitment to repair and rebuild his life. He's reviewed the various programs offered by the Bureau of Prisons and is determined to turn his life around and become a more productive, law-abiding citizen upon his release. Overall, he is on a positive trajectory, and he enjoys the support of a loving family and friends.

Unlike many individuals leaving prison, Mr. Owens has both the support of a strong family and friends in the community. This is evident from the numerous letters that have been submitted as exhibits with this pleading.[7]  Moreover, it is this level of family support that will ensure Mr. Owens's reentry and continued rehabilitation. These are important factors that will ensure his success on supervised release and ultimate rehabilitation.

The importance of family support has been highlighted in both qualitative and quantitative research efforts using a variety of samples across the United States. Existing

---

[7] See Exhibit 1.

research has shown that family support correlates with decreased recidivism,[8] increased odds of employment,[9] and better mental health outcomes[10] during reentry. "[F]or most former prisoners, relationships with family members are critical to successful reintegration."[11] Family members, like those in Mr. Owens's family, provide both strong affectionate bonds (like emotional support and attachment) and important mechanisms of social support (like housing, transportation, and financial support). These are essential and can serve to reduce recidivism and promote Mr. Owens's successful reentry.

In recent months, through discussions with counsel, family, mental health counselors, study, and introspection, Mr. Owens has begun to understand how his past has affected his life. He feels a deep sense of remorse for his actions and those who have been hurt by them. He is also deeply saddened by how his actions have impacted his family and community, both now and in the future. Mr. Owens has consistently expressed a desire to get the help that he needs and to once again, become a productive member of the community.

### Nature and Circumstances of the Offense

The nature and circumstances of the offense are detailed in the pre-sentence report. Mr. Owens assisted the authorities in the investigation and prosecution of his own

---

[8] John H. Boman, IV and Thomas J. Mowen, *Building the Ties That Bind, Breaking the Ties That Don't, Criminology & Public Policy* 16:753–74 (2017); Tracey L. Shollenberger, Urban Institute, *When Relatives Return: Interviews with Family Members of Returning Prisoners in Houston, Texas* (2009).

[9] Mark T. Berg and Beth Huebner, Reentry and the Ties That Bind: An Examination of Social Ties, Employment and Recidivism, *Justice Quarterly* 28:382–410 (2011)

[10] Suzanne Grieb, M.D., *et al.,* The Stress Will Kill You': Prisoner Reentry as Experienced by Family Members and the Urgent Need for Support Services, *Journal of Health Care for the Poor and Underserved* 25:1183–200 (2014).

[11] Rebecca L. Naser and Christy A. Visher, Family Members' Experiences with Incarceration and Reentry, *Western Criminology Review* 7:20–31 (2006).

misconduct by timely notifying the government of his intention to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.  Mr. Owens has been cooperative with investigative agencies and has consistently expressed remorse and accepted responsibility for his actions.

### Need for Sentence Imposed Pursuant to 18 U.S.C. § 3553(a)(2)

18 U.S.C. § 3553(a)(2) requires a sentencing court to impose a sentence that reflects the seriousness of the offense; promotes respect for the law; and provides just punishment, adequate deterrence, and necessary training.

1. Seriousness of the Offense; Respect for the Law; Just Punishment

Mr. Owens has expressed remorse for and has accepted responsibility for his criminal conduct.  He not only "clearly demonstrated acceptance of responsibility for the offense," but he was cooperative with investigating agencies, showing his respect for the law and willingness to receive just punishment.  Mr. Owens has a criminal history score of zero, which yields a criminal history category of I. PSR ¶ 28.

Overall, Mr. Owens has been a generally law-abiding citizen, and for the most part, he has been compliant with authority and seems capable of living a law-abiding lifestyle.  This is corroborated by his impeccable work history and his honorable service to the United States of America as a member of the United States Marines.  Thus, the requested sentence adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

2. Adequate Deterrence; Training and Rehabilitation

The requested sentence would provide adequate deterrence because of his low risk of recidivism related to his general compliance with the law, age upon release, and willingness to rehabilitate. Furthermore, the fact that Mr. Owens has no criminal history points and his criminal history category of I place him at a substantially reduced risk of recidivism and therefore, the requested term of incarceration is adequate deterrence to achieve the goals set forth in 18 U.S.C. § 3553(a)(2). *See* United States Sentencing Commission, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 14 (March 2017) ("Overall, an offender's total criminal history score is a strong predictor of recidivism. Rearrest rates range from a low of 30.2 percent of offenders with zero criminal history points to a high of 85.7 percent for offenders with 15 or more criminal history points."). Moreover, his recidivism risk is further ameliorated because of his healthy support network and supportive family.

Lastly, a sentence of 300 months is sufficient to achieve deterrence because research indicates that increases in the *severity* of punishment are far less important to producing deterrent effects than the *certainty* of punishment (if severity is relevant at all). *See* Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, 1. Indeed, virtually no empirical data suggests that harsher (*i.e.*, lengthier) sentences achieve better general deterrence than moderate sentences. After reviewing the available evidence on whether harsher sentences deter, Professor Doob asked and answered the following question:

> *Can we conclude that variation in the severity of sentences would have differential (general) deterrent effects? Our reply is a resounding no. We could find no conclusive evidence that supports the hypothesis that harsher sentences reduce crime through the*

> mechanism of general deterrence. Particularly given the significant body of literature from which this conclusion is based, the consistency of the findings over time and space, and the multiple measures and methods employed in the research conducted, we would suggest that a stronger conclusion is warranted. More specifically, the null hypothesis that variation in sentence severity does not cause variation in crime rates should be conditionally accepted.

Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 187 (2003). Indeed, "[t]he findings regarding general deterrence are relatively settled":

> The existing data show that in the absence of the threat of punishment for criminal conduct, the social fabric of society would readily dissipate; crime would escalate and overwhelmingly frustrate the capacity of people to lead happy and fulfilled lives. Thus, general deterrence works in the absolute sense: there is a connection between criminal sanctions and criminal conduct. However, there is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime rate…. It is counter-intuitive to suggest that higher penalties will not reduce the crime rate. However, the evidence is relatively definitive.

Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted). In sum, "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime." *Id.* at 1203. So general deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid," which "could be satisfied by a fine or a short prison term." *Id.* at 1205.

For the reasons stated above, a sentence of 300 months of incarceration would sufficiently accomplish retributive, rehabilitative, and deterrence goals, and anything longer would be unnecessary.

## Collateral Consequences of Conviction

Mr. Owens has taken full responsibility for his criminal conduct. He feels deep remorse and Mr. Owens is prepared to face the consequences of his actions. As mandated by § 3553(a), the consequences should not be greater than necessary. The consequences Mr. Owens has already suffered and will continue to experience as a federal felon and registered sex offender provide serious punishment and afford both general and specific deterrence. As a result of his actions, he will serve a lengthy term of imprisonment that will separate him from his friends and family for an extended time. He also faces the consequences that come with living as a convicted sex offender.

Upon his release from custody, Mr. Owens faces a number of significant restrictions as a convicted sex offender. In many communities, his movements in the community – including moving homes and taking vacations – are potentially restricted and supervised. Many state laws prohibits sex offenders who had a minor victim and who are on probation, parole, or mandatory supervision from living in or visiting a residence within 500 feet of a child safety zone. This includes schools, day care facilities, parks, playgrounds, youth centers, sports field, and more. Child safety zones can apply outside of where any individual lives.

While a convicted sex offender (with a minor victim) remains under court supervision, he is prohibited from involvement in civic, cultural, or athletic programs that include children 17 years old and younger. Such an individual also cannot participate in programs that meet on or near parks or schools. For Mr. Owens, these restrictions will

impact and limit him for a substantial amount of time—10 years if this Court imposes the term of supervision advocated for by the defense.

A sex offense conviction can bar him from working in a number of professions and obtaining various professional licenses. He is unlikely to be licensed or hired for positions within schools, day care centers, sports facilities, medical facilities, or law firms. He may also not be able to work in restaurants or stores since businesses that serve the public are often uncomfortable hiring sex offenders.

In addition to sex offender restrictions and registration requirements in his state of residency, Mr. Owens will be subject to several years and possibly a lifetime term of supervised release. Although supervised release will provide resources and a source of structure for Mr. Owens, it also involves substantial restrictions on his liberty, which is particularly true for convicted sex offenders. This constitutes further punishment for the instant offense.

Under the standard conditions of supervised release, among other conditions, Mr. Owens will not be allowed to use the Internet, he must continue to participate in extensive sex-offender treatment, he must submit to polygraph testing on a continuing basis, he is not allowed to have unsupervised contact with minors (meaning that he is not allowed to attend places or activities where children will be present), and his ability to travel is severely curtailed.

As a federal felon and registered sex offender, Mr. Owens will be dealing with the consequences of his conduct for the rest of his life. Courts have recognized the serious collateral consequences inherent to a conviction of this nature, and have varied

downward on this basis. *See, e.g., United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming downward variance where the district court found that the loss of a teaching license and state pension adequately reflected "the need for just punishment" as well as the need for "adequate deterrence").

**The Requested Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law, Provides Just Punishment, and Protects the Public**

The defense respectfully submits that a sentence not to exceed 300 months of incarceration followed by a 10-year term of supervised release is sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and protects the public.

The sentence suggested by the defense is more than sufficient to protect the public from Mr. Owens. Such a sentence is enough time to allow Mr. Owens to obtain mental health, substance abuse and sex offender treatment, which will help lower his risk of recidivism. Additionally, upon his release from incarceration, he will be subject to supervised release conditions and must register as a sex offender. Given that he will be subject to a rigid set of rules, and strict supervision by the probation office of this Court, Mr. Owens is unlikely to pose a future threat to society once released from prison.

Furthermore, a lengthier sentence matching the Guideline recommendation would not necessarily result in a lower risk of recidivism. In fact, the opposite is true, especially for defendants like Mr. Owens who have never been previously incarcerated. *See, e.g., United States v. Graf*, No. 07-CR-320, 2008 WL 5101696, at *2 (E.D. Wis. Dec. 1, 2008) citing *United States v. Qualls,* 373 F.Supp.2d 873, 877 (E.D.Wis.2005) ("Generally, a

lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").   Research indicates that the *severity* of punishment is *less* likely than the *certainty* of punishment to produce deterrent benefits. *See* Valier Wright, *Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project, at 1 (Nov. 2010) (emphasis in the original); *see also* Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Justice 143, 146 (2003) ("harsh sentences do not deter").   Thus, sentencing Mr. Owens close to or to the advisory sentencing guideline range would *not* increase deterrence.   To best deter Mr. Owens from committing offenses in the future, providing mental health, substance abuse, and sex offender counseling and treatment would serve as better alternatives to a sentence in excess of 11 years of incarceration.

Similarly, the Sentencing Project report notes that more severe sentences fail to enhance public safety.   Contrary to ideology that "putting people in prison for years or even decades should prevent offenders from re-offending by incapacitating them and/or deterring would-be-offenders from committing crimes[,]" studies fail to support these assertions. *Valier Wright, Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment, The Sentencing Project,* at 6.   A series of studies, examining the public safety effects of imposing longer periods of imprisonment, reveals that longer prison sentences were associated with a three percent increase in recidivism compared to shorter sentences. *Id.*   In fact, "[o]ffenders who spent an average of 30 months in prison had a

recidivism rate of 29%, compared to a 26% rate among prisoners serving an average sentence of 12.9 months." *Id.*

Sentencing Mr. Owens to term not to exceed 300 months' incarceration, followed by a 10-year term of supervised release and registration to the sex offender registry would also sufficiently reflect the seriousness of the offense and promotes respect for the law. Mr. Owens understands the gravity of what he did and knows he must be punished. Eleven years in prison is more than enough punishment in this case.

### Avoiding Unwarranted Sentencing Disparities

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A sentence of 25 years would represent a variance from the advisory range but would be consistent with variances in similar cases and with the emerging judicial recognition of the irrationality of the child pornography sentencing guideline. According to the United States Sentencing Commission, **57.2 percent of production offenders** received below-guidelines sentences. [12] As recent examples:

- In *United States v. Cortista*, No. 4:22cr69, ECF No. 41 (E.D. Va. Feb. 24, 2023) (Young, J.), the 38-year-old defendant was convicted of production of child pornography, where he made two videos performing oral sex on a 4-year-old boy he sometimes cared for. The Court sentenced him to 210-months imprisonment.

- In *United States v. Dylan Seader*, No. 2:22CR69, (E.D. Va. March 10, 2023) (Smith, J.), the defendant received 240 months for production of child pornography. A forensic review of the defendant's devices revealed "several sexually explicit

---

[12] *See* United States Sentencing Commission, *Federal Sentencing of Child Pornography: Production Offenses*, *available at* https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-production-offenses (last visited January 15, 2024.)

videos of the defendant with an approximate 18-month-old child. SEADER was performing a sexual act on the child." *See* Gov't Pos. on Sent., at ECF No. 31, at 2. Also, on his devices were "two known series of child pornography, as identified by the National Center for Missing and Exploited Children." *Id*. The defendant was only caught because he agreed to meet up and have sex with an individual he believed to be a fourteen-year-old child.

- In *Unites States v. Francis*, No. 4:21CR83, (E.D. Va. September 8, 2022) (Allen, J.), the 27-year-old defendant was convicted of receipt of child pornography and had a lengthy history of hands-on offenses, including two juvenile adjudications for aggravated sexual battery. The Court sentenced him to 204 months followed by a life term of supervised release.

- In *United States v. Ethan Roberts*, No. 2:22cr141, ECF No. 32 (E.D. Va. April 23, 2023), the 29-year-old defendant traveled from Arizona to Virginia, engaged in sexual acts with a 14-year-old runaway, and took her back to Arizona. He also took her devices so that no one could find her and instructed her to sell images of herself online. *See* Gov't Pos. on Sent, at ECF No. 27, at 8. This Court sentenced Mr. Roberts to 360 months, noting many of these facts as particularly aggravating.

- In *United States v. Joseph Allen*, 2:24 CR 16 (E.D. Va. October 18, 2024). In this case, the defendant sexually assaulted a four-year old girl, recorded the assault, and disseminated the recordings. According to the government, the evidence showed that the defendant was "excited and eager to hurt the little girl." Allen would go on to share child sexual abuse material over the internet, including for a profit." *See* Gov't Pos. on Sent, at ECF No. 37, at 3-4. The Court sentenced the defendant to 23 years.

- In *United States v. Andrew Kross*, 2:24 CR 29 (E.D. Va. January 14, 2025). In this case, the defendant used teen chat websites to target female teens between the ages of 14 to 16 years old and convinced them to create and provide him with child sex abuse materials for his own benefit. He encouraged his victims to insert objects into their vaginas and anuses, items such as sharpies and brush handles. When they complied with these requests, defendant demanded they take pictures and videos of these acts and send them to him using various social media apps. The defendant sent pictures to these minors of his own genitalia and would send them voice messages. *See* Gov't Pos. on Sent, at ECF No. 36, at 3-4. The Court sentenced the defendant to 204 months.

- In *United States v. Christopher Digges*, 2:23CR140 (E.D. Va. October 25, 2024), the defendant was charged in an 11-count indictment with producing,

receiving, and possession of child pornography, and enticement and coercion of a minor. The defendant moved in with a single mom and her child after offering to help them by paying rent. The defendant sexually and physically abused the victim when she was 11 to 14 yeas old. The defendant also used manipulation and threats against the victim over a number of years. *See* Gov't Pos. on Sent, at ECF No. 33, at 5-8. The Court sentenced the defendant to 348 months.

Mr. Owens's conduct was extremely serious. When compared against other cases in this district, a sentence of 25 years is appropriate such that any sentence greater would yield an unwarranted sentencing disparity. Mr. Owens did not touch any child, nor did he ever meet or attempt to meet with any child. He himself never threatened or blackmailed anyone; indeed, to the contrary, as cited below, he admonished other members of the conspiracy not to use any threatening behaviors in the course of the conspiracy. He has no criminal history. As more fully set forth below, his years of life outside of this offense militate in favor of a lower, but still very serious and lengthy sentence. He accepted responsibility and did not proceed to trial. He feels and expresses remorse. For all these reasons, the 25-year sentence followed by a ten-year term of supervised release is commensurate with other cases in the district and avoids unwarranted sentencing disparity.

## Supervised Release

When applied to Mr. Owens, the sentencing factors enumerated in 18 U.S.C. § 3553(a) mandate a term of supervised release not to exceed ten years. As a condition of the Court's sentence, Mr. Owens will receive extensive sex offender treatment, which will further protect the public by preventing recidivism. This treatment will include an

offense-specific evaluation, and a subsequent referral to an offense-specific treatment program.  Mr. Owens will be subject to regular polygraph examinations, individualized treatment, and continued supervision by the Court long after his release from prison. Reviews of sex-offender-treatment programs show that cognitive-behavioral therapy, relapse prevention, and self-regulation training have proven successful in treating offenders. *See, e.g.*, Tony Ward, Theresa Gannon, and Pamela Yates, *The Treatment of Offenders: Current Practice and New Development with An Emphasis on Sex Offenders*, 15 Int'l Rev. Victimology 183 (2008); Steve Aos, Marna Miller, and Elizabeth Drake, Washington State Institute for Public Policy, *Evidence-Based Adult Corrections Programs:  What Works and What Does Not,* at  5-6 (2006) (concluding after review of six "rigorous" studies that "cognitive-behavioral therapy for sex offenders on probation significantly reduces recidivism").

Such treatment, designed to achieve rehabilitation, can and should occur in the community. Kimberly Wiebrecht, *Evidence-Based Practices and Criminal Defense: Opportunities, Challenges, and Practical Considerations* 8 (2008), *available at* http://nicic.gov/library/files/023356.pdf ("[t]he research...states that treatment interventions are more effective when provided to defendants while they are in the community rather than in an institutional setting."); *see also* Bitna Kim *et al.*, *Sex Offender Recidivism Revisited: Review of Recent Meta-analyses on the Effects of Sex Offender Treatment*, 17 Trauma, Violence, and Abuse 1, 11 (2016) ("The research indicates that treatment in the community is more effective than treatment in institutions. Although there may be obstacles to changing existing exclusionary policies; evidence demonstrates that sex

offenders, both adolescent and adult, can be treated successfully in community settings.").

A lengthy term of supervision places Mr. Owens under the auspices of the court for many years following his release and will provide him the opportunity to transition from prison to society. Moreover, it will provide him with continued treatment, counseling and supervision, which further serves to protect the public. Finally, it is an essential element to a sentence that is sufficient, but not greater than necessary.

### Recommendation to the Bureau of Prisons

Mr. Owens respectfully requests that the court recommend to the Bureau of Prisons that he be confined at FCI Petersburg in Petersburg, Virginia. FCI Petersburg is home to one the BOP's Sex Offender Management Programs (hereinafter SOMP). [13] The SOMP facilities, such as Petersburg, have a more robust Psychology Department, a Sex Offender Treatment Program (either residential or non-residential), and a higher percentage of sexual offenders in the general population.

According to the Bureau, SOMP facilities are designed to fulfill the unique needs of incarcerated sexual offenders, including:

- Enhanced monitoring for offending behaviors
- Protection from other inmates
- The sometimes more sophisticated criminality of this population

This special mission makes SOMP facilities easier for sex offenders to survive. They enable these inmates to stay at the prison without threat to their lives. By housing this

---

[13] https://www.bop.gov/policy/progstat/5324_010.pdf

specialized population in certain prisons, prison officials can also monitor them more effectively.

FCI Petersburg provides Mr. Owens the treatment and services he needs, and he wants to participate in them. In addition, this facility is closest to his home and family. While he understands that the BOP is not bound by the court's recommendation, he asks the court to include such a recommendation in its sentencing order.

## Special Assessments and Fine

Currently, there are three (3) potential special assessments the Court may impose. The first, in the amount of $100.00, is mandatory for each count, regardless of the ability to pay. However, the other two (2), under 18 U.S.C. §§ 3014 and 2259A(a)(2), allow the Court to make the determination as to whether Mr. Owens has an ability to pay. He submits that he does not have the financial ability to pay the additional special assessments or a fine in this matter. Mr. Owens requests that this Court impose only the $100 special assessment in conjunction with the restitution, as set forth above.

## CONCLUSION

With the *correct treatment*, including sex offender, substance abuse and individualized psychotherapy, Gary Owens, Jr., can be a prosperous and productive member of society who will not reoffend. Mr. Owens deserves a chance to get the help he needs, to dive deeper into the complexities of his childhood trauma and become a prosperous and productive member, and move forward, no matter what terrible choices he has made in the past. The 300-month sentence, followed by a 10-year term of supervised release will give him more than enough time to get effective treatment in all

of these areas, obtain educational and vocational opportunities and certifications, and make a plan for his future, all while offering a severe and firm punishment for his criminal conduct.

Respectfully submitted,

GARY OWENS, JR.

By: _____/s/_____
    Rodolfo Cejas, II
    VSB No.: 27996
    Attorney for Gary Owens, Jr.
    Office of the Federal Public Defender
    500 East Main Street, Suite 500
    Norfolk, Virginia 23510
    (757) 457-0885 (telephone)
    (757) 457-0880 (facsimile)
    Rodolfo_Cejas@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of April 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By: _____/s/_____

Rodolfo Cejas, II
VSB No.: 27996
Attorney for Gary Owens, Jr.
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
(757) 457-0885 (telephone)
(757) 457-0880 (facsimile)
Rodolfo_Cejas@fd.org